# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 19-1582V

|  |  |
|---|---|
| PAMELA BRACKLEY,<br><br>                    Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br><br>Filed: March 4, 2026 |

*Nancy Routh Meyers, Turning Point Litigation, Greensboro, NC, for Petitioner.*

*Alec Saxe, U.S. Department of Justice, Washington, DC, for Respondent.*

**DECISION GRANTING INTERIM AWARD OF DAMAGES,
AND FINDINGS WITH RESPECT TO LIKELY PAIN AND SUFFERING AWARD**[1]

On October 10, 2019, Pamela Brackley filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] ("Vaccine Act"). Petitioner alleged that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of a tetanus-diphtheria-acellular pertussis ("Tdap") vaccine received on November 22, 2018. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters. The matter was conceded in Petitioner's favor, but the parties could not agree to damages, so their dispute was presented for my resolution.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

As agreed upon by the parties, based on Petitioner's reassignment to a lower paying position, I award damages on an interim basis in the amount of **$68,908.65** in past lost wages, from the time of her injury through March 2020. Further, I preliminarily find that Petitioner would be entitled to an award of *at least* $173,000.00 for past pain and suffering. The final pain and suffering disposition, plus remaining disputed damages components, shall be resolved in the manner discussed below.

## I.    Procedural History

The case was assigned to the SPU in November 2019. ECF No. 10. On May 26, 2021, Respondent filed a Rule 4(c) Report conceding entitlement to compensation and I entered a Ruling on Entitlement in Petitioner's favor. ECF Nos. 35-36. The parties then embarked on an extraordinarily long damages negotiation.

The parties first disagreed on the import of Petitioner's potential worker's compensation claim to her damages. *See* ECF No. 44 at 1-2. On November 19, 2021, I issued a scheduling order noting that pursuant to Section 15(g) of the Vaccine Act, Petitioner had an "obligation to pursue alternative sources of benefits to the extent they are available," but that I did not have the authority to compel Petitioner to file a worker's compensation claim. *See id.* Petitioner then opted to file a worker's compensation claim. Negotiations remained at a standstill until Petitioner's claim was denied in June 2022. *See* ECF No. 53.

Subsequently, Respondent requested additional evidence regarding Petitioner's lost wage claim. ECF No. 55. By August 2023 (now over one year later), the parties had again reached an impasse regarding Petitioner's claim for future lost wages, specifically whether her reassignment to a less lucrative position had been caused by her shoulder injury. ECF No. 62 at 1-2. I denied Petitioner's request to retain a vocational expert, but I ordered Petitioner to file records related to why she was reassigned. *Id.*

Petitioner obtained relevant documents from her employer, and the parties resumed informal negotiations. *See* ECF No. 66. However, by August 2024, another year later, the parties still could not agree on future lost wages. ECF No. 71 at 1. Petitioner requested, and I approved, a functional capacity evaluation. *Id.* at 1-2. After Petitioner obtained this evaluation (discussed further below), the parties again attempted to resolve this matter informally.

In January 2025, Petitioner filed records of new and ongoing medical treatment, introducing the question of whether this was connected to her SIRVA. In June 2025, the

parties indicated that they were at an impasse in their damages negotiations and that Petitioner was considering undergoing surgery. ECF No. 85.

On July 8, 2025, I held a status conference and ordered the parties to brief damages in every category, including Petitioner's recent medical treatment. ECF No. 86. On August 29, 2025, Petitioner filed a status report requesting that I permit her to retain an economic expert as well as a vocational rehabilitation expert "to evaluate and report on her lifetime economic losses as a result of her vaccine injury." ECF No. 88 at 1. Petitioner also indicated that Respondent did not consent to engaging these experts. *Id.*

On September 15, 2025, I held a status conference regarding Petitioner's request. ECF No. 92. I noted that "[t]he medical record to date suggests that Petitioner's treatment mostly ended in 2020 – and therefore that damages should only be calculated through that time." *Id.* at 1. However, if Petitioner was correct that her more recent treatment was connected to the conceded SIRVA, "these events would be the basis for additional damages, including more lost wages." *Id.* I stated that the question of Petitioner's current condition and any additional damages to which she could be entitled might need to be decided outside of the SPU. *Id.* at 2. But in an effort to decide as much of the case as possible, I adjusted the previous scheduling order to only have the parties brief damages "*through March/April 2020 only,*" and indicated that I would issue an interim decision on damages for that timeframe. *Id.* at 1-2 (emphasis in original).

On September 26, 2025, Petitioner filed her brief in support of her claimed damages. ECF No. 95 ("Pet'r Br."). On October 31, 2025, Respondent filed his response brief. ECF No. 96 ("Resp't Br."). This matter is thus ripe for resolution.

## II.    Background

### A.    Petitioner's Vaccination and Initial Treatment

At the time of vaccination, Petitioner was 57 years old and employed as an emergency department night-shift nurse at the Fayetteville Veterans Affairs Medical Center ("VAMC"). Petitioner had worked as an emergency care nurse throughout her career. Ex. 43 at 1. Petitioner received a Tdap vaccine in her right arm on November 22, 2018 after she had an accidental exposure to a patient's blood in her eye at work. Ex. 1 at 3, 15. Petitioner did not have any history of right shoulder pain or dysfunction.

On November 26, 2018, Petitioner reported right arm pain to her primary care physician ("PCP"), Dr. Peggy Barnhill. Ex. 2 at 12-13. Petitioner had "some swelling and warmth of the right arm below where [the] shot was given." *Id.* at 12. Dr. Barnhill

3

prescribed the antibiotic cephalexin and referred her to orthopedics. *Id.* at 13.

Petitioner saw nurse practitioner ("NP") Thomas Lawson at EmergeOrtho on November 27, 2018. Ex. 3 at 31. Petitioner reported a constant right shoulder pain that was currently 3/10 and 8/10 at its worst. *Id.* at 33. NP Lawson diagnosed Petitioner with impingement of the right shoulder and a possible rotator cuff tear. *Id.* at 37. NP Lawson administered a cortisone injection, which provided Petitioner with only mild symptom relief, and ordered an MRI of the right shoulder.[3] *Id.*

Petitioner returned to EmergeOrtho on December 4, 2018. *Id.* at 23. Petitioner again reported constant right shoulder pain that was 3/10, or 6/10 at its worst. *Id.* NP Lawson recommended a manipulation under anesthesia and then physical therapy ("PT"). *Id.* at 27. Petitioner underwent this procedure on December 11, 2018. *Id.* at 38.

Petitioner began PT at Columbus Regional Healthcare System ("Columbus Regional") the next day, December 12, 2018. Ex. 5 at 6. Post-manipulation, she reported her right shoulder pain to be 4/10, an 8/10 at worst, and 2/10 at best. *Id.* The physical therapist noted that Petitioner had "limited use of the right upper extremity" and that she was taking Vicodin and Aleve for pain control. *Id.*

On December 21, 2018, Petitioner had another follow-up appointment with NP Lawson. Ex. 3 at 17. At this point, Petitioner did not request a refill of her pain medications and she was encouraged to use NSAIDs, Tylenol, and ice. *Id.* at 19, 20. NP Lawson prescribed a dose pack of oral steroids for inflammation. *Id.* at 20. NP Lawson assessed Petitioner as having a "[c]omplicated post-operative course." *Id.*

Petitioner participated in at total of 14 PT sessions at Columbus Regional between December 12, 2018 and January 15, 2019. During some of these sessions, Petitioner reported constant pain (3/10 or 4/10) and that she did not feel that the pain was getting better. *See* Ex. 5 at 16, 25. By January 15, 2019, the physical therapist advised Petitioner to speak to her doctor and not come to her next session due to feeling like she was "not getting anywhere with therapy" and that her pain was getting worse. *Id.* at 28.

On January 18, 2019, Petitioner saw NP Lawson. Based on her reports of continued pain and limited range of motion ("ROM"), NP Lawson proposed a possible rotator cuff tear and also possibly "another process at play that is irritating the brachial or axillary nerve." Ex. 5 at 17. NP Lawson administered a steroid injection to Petitioner's

---

[3] The MRI revealed 1) glenohumeral osteoarthropathy with intermediate grade chondromalacia and a type 2C SLAP tear; 2) adhesive capsulitis; and 3) cuff tendinosis and peritendinobursitis with no macrotear. Ex. 3 at 48.

right shoulder and also ordered a repeat MRI and electromyogram ("EMG") to rule out nerve involvement.[4] *Id.* at 16-17, 19.

Petitioner returned to EmergeOrtho on January 23, 2019 and saw Dr. Joanne Allen. *Id.* at 9. Petitioner reported that despite doing PT, she continued to have "severe pain" that was "deep in [her] joint" and "burning hot." *Id.* at 11. Further, the steroid injection had not helped the pain. *Id.* Dr. Allen described Petitioner as holding her right arm and shoulder in a "very tightly controlled position." *Id.* Petitioner also displayed a significantly limited ROM due to this severe pain. *Id.*

Dr. Allen attempted an EMG at this appointment, but it was difficult to perform because Petitioner was "in so much pain" that she was unable to relax her right arm. *Id.* at 12. The results showed a possible supraspinatus and axillary neuropathy component, but nothing definitive. *Id.* Dr. Allen recommended that Petitioner schedule a follow-up with the doctor who performed the manipulation under anesthesia to compare her MRI results. Dr. Allen also considered performing a repeat EMG if Petitioner's pain could be better controlled. *Id.* In the interim, Dr. Allen prescribed Petitioner gabapentin for her "neuropathic type of pain."[5] *Id.*

## B.    Petitioner Undergoes Surgery and Post-Operative PT

On February 6, 2019, Petitioner saw Dr. Douglas Messina at Carolina Sport Medicine & Orthopaedic Specialists ("Carolina Sports Medicine") for a second opinion. Ex. 6 at 10. Dr. Messina similarly diagnosed Petitioner with right shoulder impingement with partial rotator cuff tear with a history of adhesive capsulitis. *Id.* Dr. Messina noted that Petitioner had continued to have pain despite a steroid injection, PT, and the manipulation. *Id.* Dr. Messina recommended that Petitioner consider surgery. *Id.* Petitioner then had three more appointments to further discuss the surgery and for a pre-operative evaluation. *See id.* at 9; Ex. 2 at 54; Ex. 7 at 16.

Petitioner underwent surgery on March 1, 2019. Dr. Messina performed a right shoulder arthroscopy with glenohumeral debridement, biceps tenotomy, subacromial decompression, and distal clavicle resection. Ex. 7 at 9. Three days later, Dr. Messina found Petitioner to be doing well and prescribed post-operative PT. Ex. 6 at 8.

---

[4] The second MRI revealed 1) possible small undersurface/rim rent tear of the supraspinatus; 2) mild tendinosis and partial-thickness tearing of the supraspinatus and infraspinatus; 3 mild subacromial subdeltoid bursitis; and 4) severe acromioclavicular joint osteoarthritis. Ex. 5 at 74.

[5] Petitioner also saw NP Lawson on January 25, 2019 for her six-week evaluation post-manipulation. Ex. 3 at 7. NP Lawson wrote that Petitioner pain was not well-controlled. *Id.* NP Lawson indicated that he would discuss her case and determine if possible surgical intervention was appropriate. *Id.* at 8.

On March 12, 2019, Petitioner had her initial evaluation at Renew Physical Therapy ("Renew PT"). Ex. 8 at 42. Petitioner described the history of her injury, including that her pain continued to get worse despite the manipulation under anesthesia and the first round of PT. *Id.* Petitioner now reported that she was no longer having sharp right shoulder pain. *Id.* Petitioner stated that her pain was currently 0/10 and 4-5/10 maximum if she actively moved it. *Id.*

Petitioner attended PT two to three times per week thereafter, for a total of 27 sessions. *See id.* at 3-44. Petitioner repeatedly told the physical therapist that her pain was only 1/10, or that she had no pain that day, and that she was getting better.[6] *See id.* at 11, 15, 16, 22, 23, 26, 31. However, on June 7, 2019, Petitioner reported that although she had no pain in the shoulder at rest, she had 3/10 pain in the last week and overall more discomfort. *Id.* at 5. Petitioner also reported that she had needed to use pain medication and muscle relaxers. *Id.* Based on this report, the physical therapist believed that Petitioner had plateaued and discharged her from PT. *Id.* at 3.

On June 10, 2019, Petitioner saw Dr. Messina and explained that she had been doing well until the past couple of weeks when the weight used at PT had been increased. Ex. 6 at 5. Petitioner complained of increasing pain over the anterior aspect of her shoulder. *Id.* Dr. Messina did not believe that she had plateaued and referred her to a different physical therapist to focus on stretching and ROM. *Id.*

Petitioner returned to Columbia Regional for further PT. On June 13, 2019, at her initial intake evaluation, Petitioner reported 3/10 pain that was 6/10 at its worst. Ex. 5 at 67. After several sessions, by July 30, 2019, Petitioner reported that she was doing well and had minimal pain in her right shoulder.[7] *Id.* at 37. However, Petitioner also stated that she still could not use her arm to push herself up off the floor and felt that she was weak overhead and dropped things. *Id.* On August 6, 2019, Petitioner requested to be discharged from PT because she "felt as good as she was going to get." *Id.* at 71. At that time, the physical therapist noted that Petitioner had "progressed slowly, yet satisfactorily with PT intervention." *Id.* In total, Petitioner completed 11 PT sessions at Columbus Regional.

---

[6] Petitioner also had an appointment with Dr. Messina on May 1, 2019. Ex. 6 at 6. Petitioner reported that she was doing well and "progressing with her therapy," but still had some tightness with overhead activities and reaching behind her back. *Id.*

[7] On July 8, 2019, Petitioner saw Dr. Messina and also reported that she was doing better. Ex. 11 at 13. Dr. Messina wrote that Petitioner should continue with PT and was "making great improvements." *Id.*

### C.     Petitioner Has Regular Follow-ups With Her Orthopedist Through March 2020

After her discharge from PT, Petitioner regularly followed-up with Dr. Messina. On August 7, 2019, Petitioner told Dr. Messina that she had made good improvement in her ROM and strength, but still had some weakness, especially while lifting over her head. Ex. 11 at 12. Similarly, on September 11, 2019, Petitioner stated that she was doing much better and had an improved ROM, but still felt weak. *Id.* at 11.

On October 2, 2019, Petitioner complained to Dr. Messina that she had some pain in the shoulder with certain activities, but felt that she was slowly improving. Ex. 11 at 10. Dr. Messina found that Petitioner "still ha[d] some slight capsular tightness and some residual paint anteriorly with activities." *Id.* Dr. Messina administered a steroid injection. *Id.*

At her next appointment on November 11, 2019, Petitioner reported that the injection had helped and that she felt she was getting stronger and having greater ROM. Ex. 11 at 9. Petitioner made similar statements on January 29, 2020, although she stated that she still had some pain when doing heavy lifting or reaching across her body. *Id.* at 8. Petitioner planned to continue with her home exercise program ("HEP"). *Id.*

On March 11, 2020, Petitioner had her final appointment with Dr. Messina for this course of treatment. Ex. 11 at 7. Petitioner continued to complain of "some occasional pain with heavy lifting" but "[o]therwise she ha[d] no other complaints." *Id.* Petitioner again stated that she was improving. *Id.* Dr. Messina found that Petitioner had full ROM. *Id.* Dr. Messina "[d]iscussed treatment options" and told Petitioner to return as needed. *Id.*

### D.     Petitioner Complains of Right Shoulder Pain in November 2024 and Receives Treatment Through the End of 2025

As stated above, I ordered the parties to only brief damages through March/April 2020. However, to provide full context to the procedural history of this matter, and because Petitioner refers to these later events in her brief, I will summarize Petitioner's second round of right shoulder treatment.

In her September 25, 2025 affidavit, Petitioner asserted that her symptoms remained present in March 2020, "but did not get substantially worse." Ex. 43 at 3. Petitioner managed her symptoms with over-the-counter pain medications, followed her HEP, and "limited [her] activities to accommodate [her] lack of right arm strength and [ROM]" *Id.* According to Petitioner, "[f]ollowing" the March 11, 2020 appointment, Dr.

7

Messina told her that "there was nothing else he could do to treat [her] SIRVA symptoms except continue with cortisol injections."[8] Ex. 43 at 3. Petitioner apparently declined to continue with these injections because she did not feel that they had been helpful previously. *Id.*

On August 14, 2024, as part of this case Petitioner underwent a functional capacity evaluation. Ex. 24 at 1. Despite having requested this evaluation, Petitioner was found to have "performed inconsistently" and "failed to give maximum voluntary effort." *Id.* The evaluator concluded that Petitioner met the material handling demands for a heavy demand vocation and could be released for full duty. *Id.*

Petitioner "unequivocally disputes" the evaluator's determination. Pet'r Br. at 10. Indeed, Petitioner asserted in her affidavit that she gave "maximum effort," even though it hurt her arm and shoulder. Ex. 43 at 4. Petitioner now claims that participating in the functional capacity evaluation caused her "intense" and "excruciating" pain, to the point that she had difficulty moving a computer mouse, and decreased her ROM significantly. *Id.* Petitioner thus blames the functional capacity evaluation for aggravating her SIRVA symptoms and uses it to connect her 2024-2025 treatment back to the treatment that concluded in March 2020. *See id.*

On November 19, 2024, Petitioner was seen by physician's assistant ("PA") Timothy Fitzgerald at Wilmington Health Orthopedics ("Wilmington Orthopedics"). Ex. 25 at 1-4. Petitioner complained of right shoulder pain and was assessed as having impingement syndrome.[9] *Id.* at 1. PA Fitzgerald took x-rays, which revealed an "area of calcification near the insertion of the rotator cuff consistent with possible calcific tendinitis . . . ." *Id.* at 2. PA Fitzgerald administered a steroid injection. *Id.* PA Fitzgerald also ordered an MRI.[10] *See id.*

Petitioner began PT at Columbus Regional Healthcare on January 31, 2025 "secondary to calcific tendinitis of the right shoulder." Ex. 29 at 7. Petitioner rated her right

---

[8] Petitioner implies that Dr. Messina gave her an unfavorable prognosis. However, Dr. Messina did not memorialize any negative view of Petitioner's condition. In particular, Dr. Messina's notes from the March 11, 2020 appointment indicate that Petitioner could return to work on full-duty, and do not state that there was nothing to be done to further help her.

[9] It does not appear that Petitioner referenced the functional capacity evaluation or otherwise indicated the onset of her pain. *See* Ex. 25 at 1-4. PA Fitzgerald did not that Petitioner had a history of a partial rotator cuff tear and that "[s]econdary to her pain and history of rotator cuff issues her activities are limited in terms of heavy lifting[,] pushing[,] and pulling at this point." *Id.* at 2.

[10] The MRI results showed presumed surgical tenodesis, no full-thickness rotator cuff tear, low signal calcification, fraying of the superior labrum with possible small SLAP tear, mild glenohumeral degenerative joint disease, and mild subacromial/subdeltoid bursitis. Ex. 26 at 2.

shoulder pain as 3/10 currently and 8/10 at its worst. *Id.* Petitioner attended eight PT sessions through March 19, 2025. Petitioner saw "minimal functional gains" from this PT and her active ROM and function use "continue[d] to be limited . . . ." *Id.* at 40. Petitioner was discharged from PT due to the lack of progression. *Id.*

On April 10, 2025, Petitioner saw PA Fitzgerald and discussed the possibility of arthroscopic surgery. Ex. 28 at 2. On July 21, 2025, Dr. Messina performed a right shoulder arthroscopy with subacromial decompression and rotator cuff repair. Ex. 32 at 1. Petitioner had several follow-up appointments with Wilmington Orthopedics thereafter, with the most recent occurring on December 10, 2025. Ex. 33 at 1; Ex. 28 at 1; Ex. 46 at 1, 4. The Wilmington Orthopedics records indicate that Petitioner began another course of PT in July 2025 through at least October 2025, but no records from Petitioner's PT provider were filed. Ex. 33 at 1; Ex. 46 at 1.

### E.    Petitioner's Employment Impact and Reassignments

After the November 22, 2018 vaccination, Petitioner felt that her symptoms were too severe to be able to permit her to function in her job at the VAMC emergency department. Ex. 43 at 2. In particular, Petitioner was not able to use her right arm for tasks like performing CPR, transferring patients from beds and stretchers, pushing gurneys, and handling combative patients. *Id.* Petitioner used sick and annual leave to take time off from November 27 - December 25, 2018. *Id.*

On December 26, 2018, Petitioner returned to work, but was placed on light duty. Ex. 43 at 2. Light duty did not involve patient care, and required Petitioner to work during the day, when she had previously worked the night shift. *Id.* Working the night shift had allowed Petitioner to earn 10 percent night differential pay on top of her base salary. Petitioner remained on light duty through February 28, 2019. *Id.*

Petitioner had surgery on March 1, 2019, and did not work at all through September 11, 2019 while she was recovering. Ex. 43 at 2; Ex. 11 at 12. Petitioner was not paid during this time. *Id.* When Petitioner returned to work on September 12, 2019, she remained on light duty.[11] Ex. 43 at 3.

Prior to returning to work, Petitioner had requested reassignment as a reasonable accommodation for her physical limitations. *See* Ex. 23 at 1-5. In October 2019, the VAMC offered Petitioner a temporary reassignment as a care coordinator with the Care in the

---

[11] At her September 11, 2019 appointment, Dr. Messina noted that Petitioner should not perform CPR as part of her work restrictions. Ex. 11 at 11. On November 11, 2019, Dr. Messina reiterated that Petitioner remained on light duty and should not perform CPR. *Id.* at 9.

Community program. Ex. 43 at 3. This job did not involve direct patient care. *Id.* In January 2020, Petitioner accepted this position as a permanent reassignment. *Id.* Petitioner's role changed effective March 15, 2020, and her salary decreased from $115,408.00 (with 10 percent night differential pay) to $91,479.00. *Id.*

It appears that Petitioner at least initially envisioned returning to her position as a night shift emergency department nurse. As of January 29, 2020, Petitioner told Dr. Messina that she did not feel ready to perform the heavy lifting required in the emergency department and would stay on light duty, but would like to try to return to her old job "in the next few weeks." *See* Ex. 11 at 8. Dr. Messina indicated that he would "hopefully release her to full duty" at her next appointment in six weeks. *Id.* At the March 11, 2020 appointment, Dr. Messina stated that Petitioner could return to work "in a full-duty capacity" with a gradual resumption of activities. *Id.* at 7.

Petitioner maintains that despite Dr. Messina's assessment, her SIRVA symptoms never improved enough for her to be able to perform the physical duties required of an emergency department nurse. Ex. 43 at 3. Petitioner believed that "if [she] had attempted to return to work as a nurse at the VAMC Emergency Department, [her] SIRVA symptoms could have caused [her] to do harm to a patient or be unable to properly treat a patient." *Id.* Petitioner stated that being reassigned out of patient care caused her to struggle with self-esteem and self-image issues for years because she had been a very skilled and knowledgeable emergency department nurse with decades of experience. *Id.* at 4.

## III.    Damages to be Awarded

### A.    An Interim Award of Damages is Appropriate

This decision comprises an interim award of damages from the onset of Petitioner's injury through March/April 2020 only. *See* ECF No. 92 at 2.

In a footnote, Respondent "respectfully maintains his procedural objection to the issuance of an interim damages award." Resp't Br at 2 n.1. Respondent argues that "[t]he Vaccine Act does not expressly authorize interim damages, and their use is not contemplated by the statute's text or structure." *Id*. Respondent also argues that Petitioner has not demonstrated any extraordinary circumstances that would make an interim award appropriate. *Id.*

However, "[i]n the Vaccine Program, it has been determined that special masters have the authority to award compensation on an interim basis. *Fairchild v. Sec'y of Health & Hum. Servs*., No. 13-487V, 2017 WL 6892899, at *2 (Fed. Cl. Spec. Mstr. Dec. 1, 2017) (discussing *Lerwick v. Sec'y of Health & Human Servs*., No. 06-847V, 2014 WL 1897656

10

(Fed. Cl. Spec. Mstr. Apr. 6, 2014) and *Day v. Sec'y of Health & Human Servs.*, No. 12-630V, 2016 WL 3457749 (Fed. Cl. Spec. Mstr. May 31, 2016), *mot. for review den'd,* 129 Fed. Cl. 450 (2016)). Given that entitlement was conceded several years ago, it would be unreasonable to require Petitioner to wait for resolution of the more complex and disputed questions related to her 2024/2025 treatment. *See id.*

However, I will only make an interim award for Petitioner's lost wages claim. Compensation for that type of injury can most easily be separated into different time periods, whereas damages for pain and suffering are best awarded holistically at the end of the case. Nonetheless, to facilitate a potential informal resolution of this matter, I set forth below my views on the minimum pain and suffering award to which Petitioner could receive based solely on the record through March/April 2020.

### B.    Calculation of Partial Lost Wages Award

The Vaccine Act provides for recovery of "actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections" when the injured party's "earning capacity is or has been impaired by reason of such person's vaccine-related injury[.]" Section 15(a)(3)(A). Lost earnings calculations must be performed in a "cautious manner." *Brown v. Sec'y of Health & Hum. Servs.*, No. 00-0182V, 2005 WL 2659073, at *6 (Fed. Cl. Spec. Mstr. Sept. 21, 2005). And a lost earnings award "may not be based on speculation." *Moreland v. Sec'y of Health & Hum. Servs.*, No. 18-1319V, 2022 WL 10469047, at *3 (Fed. Cl. Spec. Mstr. Sept. 2, 2022).

Here, the parties agree that Petitioner is entitled to $68,908.65 in past lost wages through March 2020. *See* Pet'r Br. at 31; Resp't Br. at 21-22. Therefore, I will award that amount in this interim decision.

However, despite my order to only brief damages through that date, Petitioner has included additional calculations to which Respondent does not agree. *See* Resp't Br. at 21-22. Petitioner argues for a further award of past lost wages for an additional period -- March 2020 to September 2025 -- based on an asserted $35,469.80 per year difference in salary between her previous nursing position and current care coordinator position.[12] Pet'r Br. at 31. Petitioner also requests future lost wages in the amount of $182,815.55. *Id.* at 31-32. Petitioner calculates these future lost wages using the same $35,469.80 annual loss figure, an anticipated retirement at age 72, a 17 percent tax rate, and a 6

---

[12] Petitioner requests total past lost wages of $230,828.28. Pet'r Br. at 31. This figure is reached by adding the pre-March 2020 lost wages of $68,908.65 to $195,083.90 (annual losses of $35,469.80 x 5.5 years), and then reducing the total $278,106.37 by 17 percent to account for taxes. *Id.* Petitioner thus seeks an additional $161,919.63 over the agreed-upon $68,908.65.

percent discount rate to reduce to present value.[13] *See id.*

Resolving Petitioner's past and future lost wage claims beyond March/April 2020 requires further fact and expert determinations that are more appropriately completed outside of the SPU. Petitioner has previously requested permission to retain a vocational rehabilitation expert and an economist, and Respondent naturally sought the opportunity to hire his own experts to respond. *See* ECF No. 88. In particular, the questions of whether Petitioner's later treatment and third surgery are sequela of the conceded SIRVA and whether she could have returned to her nursing position need to be resolved.

Further, although I previously stated at the July 8, 2025 status conference that I would expeditiously schedule a one-day hearing if Petitioner indicated in her brief that she would like to present testimony, upon review any such testimony would be most probative to the questions remaining about the post-March/April 2020 timeframe.[14] Petitioner's medical records and affidavit fully address her condition and treatment from vaccination to the cessation of treatment in March 2020, and thus I do not find that her testimony is needed prior to the issuance of this interim decision.

## IV.    Preliminary Ruling on Pain and Suffering Award

For reasons similar to those set forth above about the total lost wages to be awarded, I cannot at this time award a pain and suffering sum on an interim basis (which would result in a piecemeal determination that is subject to change later, and dependent on facts to be developed). However, based on the present record, I can note what will likely serve as a "floor" for the ultimate pain and suffering award.

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are

---

[13] Petitioner does not provide any explanation of how she chose this tax rate and discount rate.

[14] Petitioner stated in her brief that she would "like to accept the Court's offer to present testimony at a hearing." Pet'r Br. at 32.

12

inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may consider prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in a specific case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009). And, of course, I may also rely on my own experience adjudicating similar claims.[15] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (2013).

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussions in Section II of *Matthews v. Sec'y of Health & Hum. Servs.*, No. 22-1396V, 2025 WL 2606607, at *2-3 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.[16]

---

[15] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases were assigned to former Chief Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[16] Petitioner's brief introduces some confusion as to time period for which she seeks compensation. Petitioner argues in favor of an award of $200,000.00 "for the past and future pain and suffering she has endured (through March 2020)." Pet'r Br. at 32. Respondent interprets this phrasing as a request for damages for future pain and suffering beyond this timeframe, and contends that Petitioner has not made any showing of permanent injury or disability that would make such an award appropriate. Resp't Br. at 20-21. However, despite the references to the future in Petitioner's brief, I read her argument as going to duration and highlighting that even without considering her later treatment, her symptoms had not completely resolved as of March/April 2020. Notably, Petitioner does not request any specific amount per year or provide any calculation as to future life expectancy.

Petitioner requests an award of $200,000.00. In support, Petitioner cites *Schoonover* ($200,000.00 plus $1,200 per year for future pain and suffering), *Lavigne* ($198,000.00), and *McDorman* ($200,000.00).[17] Pet'r Br. at 21-25. Respondent appears to agree that Petitioner's SIRVA was "severe," but instead proposes a much lower award of $132,500.00. Resp't Br. at 9, 12-20. Respondent analogizes to six cases – *Knasel*, *Wilson-Blount*, *Hayes*, *Brantley-Karasinski*, *Blanco*, and *Mates* – in which the petitioners were awarded damages in the range of $111,000.00 to $1350,000.00.[18] *Id.* at 12-13. Respondent points to *Brantley-Karasinski* ($125,000.00) and *Blanco* ($135,000.00) as being especially comparable. *Id.* at 14-16.

Overall, Petitioner experienced an intense course of treatment over eighteen months – three steroid injections, 52 sessions of PT, two MRIs, one EMG, a manipulation under anesthesia, and an arthroscopic surgery. Petitioner consistently described pain in the 3/10 to 4/10 range, with increases to 8/10 at its worst. I also accept that her symptoms seriously impacted her career by causing her to be out of work for several months and to accept a reassignment from her longtime position as a night shift emergency department nurse.[19] Petitioner's affidavit speaks quite well to how, as an experienced nurse, being moved out of direct patient care affected her self-image. *See* Ex. 43 at 4. Further, I accept that in March 2020, Petitioner was not fully symptom-free and was still experiencing residual pain when doing heavy lifting. *See id.* at 3; Ex. 11 at 7. Nonetheless, an award of $200,000.00 would be inappropriate because Petitioner's selected comparators all involved even more severe symptoms and interventions.

Petitioner's basis for comparison is that the *Schoonover* petitioner underwent two surgical procedures, one of which Petitioner describes as a shoulder manipulation under anesthesia, as well as multiple steroid injections and numerous PT sessions. *See* Pet'r Br. at 22-23. Petitioner also points out that she and the *Schoonover* petitioner worked in the healthcare field, and posits that her own job impact was actually more severe because

---

[17] *Schoonover v. Sec'y of Health & Hum. Servs.*, No. 16-1324V, 2020 WL 5351341 (Fed. Cl. Spec. Mstr. Aug. 5, 2020); *Lavigne v. Sec'y of Health & Hum. Servs.*, No. 19-1298V, 2022 WL 2275853 (Fed. Cl. Spec. Mstr. May 12, 2022); *McDorman v. Sec'y of Health & Hum. Servs.*, No. 19-814V, 2021 WL 5504698 (Fed. Cl. Spec. Mstr. Oct. 18, 2021).

[18] *Knasel v. Sec'y of Health & Hum. Servs.*, No. 20-1366V, 2023 WL 2547961 (Fed. Cl. Spec. Mstr. March 17, 2023); *Wilson-Blount v. Sec'y of Health & Hum. Servs.*, No. 17-804V, 2021 WL 688628 (Fed. Cl. Spec. Mstr. Jan. 6, 2021); *Brantley-Karasinski v. Sec'y of Health & Hum. Servs.*, No. 20-1058V, 2023 WL 7160919 (Fed. Cl. Spec. Mstr. Sept. 28, 2023); *Blanco v. Sec'y of Health & Hum. Servs.*, No. 18-1361V, 2020 WL 4523473 (Fed. Cl. Spec. Mstr. July 6, 2020); *Mates v. Sec'y of Health & Hum. Servs.*, No. 20-1662V, 2024 WL 3425745 (Fed. Cl. Spec. Mstr. June 11, 2024).

[19] This analysis only addresses the period through March/April 2020. As discussed further below, I do not make any findings as to future lost wages, whether Petitioner's 2024/2025 treatment was related to her original SIRVA, or whether Petitioner could have returned to her nursing position at some point after March/April 2020.

14

instead of having to give up her respiratory therapist position, the *Schoonover* petitioner merely complained of pain while performing her duties. *See id.*

However, despite these facial similarities, Petitioner ignores several facts that produced the unusually high pain and suffering award in *Schoonover*. The *Schoonover* petitioner reported severe, constant pain, which she rated as 8/10. 2020 WL 5351341, at *4. After the first surgery, an arthroscopic bursectomy with extensive subacromial debridement, the *Schoonover* petitioner had no relief from pain, even with more steroid injections, and was found to still have a "profound frozen shoulder." *Id.* Although the second surgery in *Schoonover* included a manipulation under anesthesia, Petitioner fails to acknowledge that this procedure also involved an arthroscopic debridement with capsular release, and synovectomy. *See id.* Further, unlike Petitioner here, the *Schoonover* petitioner continued to have severe pain after the second surgery, requiring the use of narcotic pain medication, and lost 10-20 percent ROM in all planes of motion. *Id.* An independent medical evaluator concluded that she had a 40 percent permanent partial disability to her left shoulder. *Id.*

Here, Petitioner disputes the extent of her recovery, but the records make clear that as of March/April 2020 she had a favorable prognosis and had been discharged from treatment. Petitioner did not experience the severe, chronic pain described in *Schoonover* and did not need narcotics for a prolonged period. Further, *Schoonover* was once the "only SIRVA case in the Program where a petitioner underwent two shoulder surgeries on top of multiple steroid injections and numerous physical therapy sessions." *Id.* at *5. That decision also noted that the "petitioner had a more complicated clinical course than that seen in other SIRVA cases." *Id.*

Here, Petitioner had "multiple" steroid injections, "numerous" PT sessions, and underwent two surgical procedures, which is more than occurs in many cases, but she did not have the intractable and disabling symptoms seen in *Schoonover*. Therefore, an identical award of $200,000.00 would not be appropriate.

Similarly, Petitioner argues that *Lavigne* is analogous because the petitioner underwent two shoulder surgeries, one of which was a manipulation under anesthesia, received six steroid injections, and attended two rounds of PT. Pet'r Br. at 23. The *Lavigne* petitioner also had some sequelae after completing treatment. *Id.* However, Petitioner again does not correctly characterize the *Lavigne* petitioner's first surgery. Although the surgery *included* a manipulation under anesthesia, it also involved an arthroscopy to perform subacromial decompression, and "significant scar tissue fibrosis resection." *Lavigne*, 2022 WL 2275853, at *2. This first surgery also occurred only three weeks after vaccination -- a strong marker of the severity of the petitioner's injury. *See id.* The *Lavigne*

15

petitioner's second surgery, which occurred less than seven months later, also involved multiple procedures. *See id.* Petitioner's treatment here was not as complex and she did not have the same complication with scar tissue fibrosis. *See id.* at *6.

Petitioner's comparison to *McDorman* suffers from the same problem. Petitioner asserts that both she and the *McDorman* petitioner "underwent two surgical procedures, had numerous steroid injections, and attended over 50 [PT] sessions." Pet'r Br. at 24. With this argument, Petitioner conflates her manipulation under anesthesia with the two arthroscopic surgeries performed in *McDorman*. *See* 2021 WL 5504698, at *3. Further, the *McDorman* petitioner received ten steroid injections as compared to Petitioner's three (as of March/April 2020). *See id.* at *2. Additional factors warranting a $200,000.00 pain and suffering award in *McDorman* were that the petitioner developed pain in her other shoulder due to overuse and "suffered greatly in her ability" to care for her son with special needs. *See id.* at *4-*5. Petitioner's injury, though still severe, did not involve these added aggravations.

Although Petitioner's circumstances do not warrant a pain and suffering award in the $200,000.00 range, Respondent's arguments rely on minimizing the severity of Petitioner's manipulation under anesthesia.[20] *See* Resp't Br. at 16. Respondent's selected comparators are inapposite because they uniformly involved single surgeries. The petitioners in these cases also generally received less PT and steroid injections, even if the duration of treatment was longer in some instances.[21]

Thus, having reviewed the record and briefing, it appears that *none* of the parties' cases are particularly analogous – pro or con. The appropriate award for Petitioner should instead fall somewhere between the parties' preferred figures. The cases *Rice-Hansen* ($175,000.00), *Edwards* ($173,000.00), and *Angerosa* ($165,000.00) are useful comparators because they involved the same combination of surgical procedures as in

---

[20] "Although a manipulation under anesthesia is not as severe as arthroscopic surgery, I have ruled that it is significantly invasive enough as to count as a surgical procedure, and that it deserves more value than other, less-invasive procedures." *Angerosa v. Sec'y of Health & Hum. Servs.*, No. 22-1022V, 2025 WL 2304436, at *4 (Fed. Cl. July 7, 2025) (citing *Edwards v. Sec'y of Health & Hum. Servs.*, No. 21-56V, 2023 WL 6847484, at *3 (Fed. Cl. Sept. 11, 2023)

[21] Respondent suggests that the petitioner in *Wilson-Blount* had a treatment course "nearly identical" to Petitioner here, yet received only $120,000.00. Resp't Br. at 17. According to Respondent, the *Wilson-Blount* petitioner underwent one surgery, received four steroid injections, and completed 49 PT sessions. *Id.* However, in that case, I agreed with Respondent that any treatment that occurred after December 2021, including two cortisone injections and 24 PT sessions, could not be attributed to the petitioner's SIRVA. *Wilson-Blount v. Sec'y of Health & Hum. Servs.*, No. 21-1400V, 2023 WL 5528930, at *9 (Fed. Cl. Spec. Mstr. July 25, 2023). Therefore, this case does not present a similar course of treatment.

this case.[22]

*Rice-Hansen* provides the highest award in this range. That petitioner underwent an arthroscopic surgery and manipulation under anesthesia, three rounds of PT (40 sessions total), and a cortisone injection, but over a longer 26 month period. *See* 2022 WL 18339478, at *10. The *Rice-Hansen* petitioner was also prescribed several courses of the steroid prednisone and was unable to take NSAIDs for pain relief due to a prior anaphylactic reaction. *See id.* at *2-*4, *10. Based on these facts, Petitioner's course of treatment was less painful and shorter in time, so she should receive less than $175,000.00.

In *Edwards*, I relied on *Rice-Hansen* as the closest comparator. *See* 2023 WL 6847484, at *3-*4. The petitioner sought treatment soon after vaccination and suffered a "mild-to-moderate SIRVA for approximately eighteen months," necessitating three rounds of physical therapy (53 sessions total), two MRIs, two steroid injections, a manipulation under anesthesia, and an arthroscopic surgery. The petitioner "made good progress in her recovery" and regained most of her ROM. *Id.* at *3. Given the petitioner's quicker recovery and good prognosis, I awarded $173,000.00, "slightly less than, but close to, the sum awarded in *Rice-Hansen*." *Id.* at *4.

*Angerosa* represents a less severe injury than in *Rice-Hansen* or *Edwards.* See 2025 WL 2304436, at *4. The petitioner similarly underwent a manipulation under anesthesia and an arthroscopic surgery, but had fewer PT sessions and no steroid injections. *See id.* at *2-*4. Further, "the overall course of her treatment was four months shorter than that in *Edwards*, and 15 months shorter than in *Rice-Hansen*." *Id.* at *4. Even though the petitioner's pain was at first so severe that her treating physicians believed that she would not be a good candidate for PT, she ultimately recovered quickly after the arthroscopic surgery with no reported pain. *Id.*

In balancing the various aspects of these three cases that speak to severity and duration of the injury, an award of $173,000.00, as in *Edwards,* would be a reasonable minimum here. This figure takes into account the length of time and amount of treatment required to treat Petitioner's SIRVA as of March/April 2020. An award on the higher end of these two-procedure cases also compensates Petitioner for the disruption to her career and emotional impact. Overall, *Edwards* is a good framework for the amount of damages suitable for this set of circumstances. The ultimate figure to be awarded, however, will

---

[22] *Rice-Hansen v. Sec'y of Health & Hum. Servs.*, No. 20-1338V, 2022 WL 18339478 (Fed. Cl. Spec. Mstr. Dec. 9, 2022)*Edwards v. Sec'y of Health & Hum. Servs.*, No. 21-56V, 2023 WL 6847484 (Fed. Cl. Spec. Mstr. Sept. 11, 2023); Angerosa v. Sec'y of Health & Hum. Servs., No. 22-1022V, 2025 WL 2304436 (Fed. Cl. Spec. Mstr. July 7, 2025).

depend on the fact issues that remain to be resolved with respect to Petitioner's lost wage claim.

## Conclusion

Based on the above, I find that Petitioner is entitled to an award of interim damages. I therefore approve a Vaccine Program interim award in the amount of $68,908.65 in past lost wages through March/April 2020. In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the Court is directed to enter judgment herewith.[23]

In light of this decision and my reasoning regarding Petitioner's entitlement to at least $173,000.00 for pain and suffering, I will afford the parties one final opportunity to settle this matter entirely. If the parties cannot reach agreement by **May 4, 2026**, this matter will be transferred out of the SPU. The parties shall file a joint status report updating me on their efforts to informally resolve this case by no later than **April 6, 2026**. Or, if the parties believe that informal resolution of the remaining issues is not possible, they may file a joint status report at any point requesting immediate transfer.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[23] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by each filing (either jointly or separately) a notice renouncing their right to seek review.